UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LINDA ENSLOW o/b/o
NIURKA JORRIN,

                        Plaintiff,

-vs-                                                          Case No.  6:04-cv-884-Orl-JGG

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

                        Defendant.

_____/

## MEMORANDUM OF DECISION

On behalf of her daughter, Niurka Jorrin ["Niurka"], plaintiff Linda Enslow ["Enslow"]

appeals to the district court from a final decision of the Commissioner of Social Security [the

"Commissioner"] denying her claim for supplemental security income.  R. 10.  For the reasons set

forth below, the Commissioner's decision is **REMANDED**.

I.      **PROCEDURAL HISTORY**

Enslow first filed a Supplemental Security Income ["SSI"] application on behalf of Niurka

on November 18, 1994.  R. 10.  That application was denied on May 2, 1995, and no appeal was

filed.  R. 10.  Enslow then filed the now-pending application for childhood SSI benefits on behalf

of Niurka, alleging an onset of disability on December 8, 2000.  R. 46 - 49.  That application was

denied initially and upon reconsideration.  R. 38 - 43.

-1-

The Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"] conducted a hearing on July 8, 2003 in Orlando, Florida. R. 244 - 74. Janet White, a non-attorney, represented Niurka at the hearing. R. 10. The ALJ heard testimony from both Niurka and Enslow. R. 245. On November 20, 2003, the ALJ issued an unfavorable decision, finding that Niurka was not entitled to disability insurance benefits. R. 19. Following a review of the evidence, the ALJ found that Niurka's impairments — depressive, disruptive behavioral, and obsessive-compulsive disorders — were "severe," but that she did not meet, medically equal, or functionally equal the criteria set forth for any impairment in the listings. R. 14, 18, Finding 2. The ALJ found Niurka's testimony and subjective allegations, as well as those of her mother, were "somewhat exaggerated" considering the medical and other evidence of record. R. 19, Finding 4. The ALJ concluded that Niurka had not been under a disability at any time through the date of the decision. R. 19, Finding 7.

On April 9, 2004, the Appeals Council concluded there was no basis to overturn the ALJ's decision. R. 2. On June 8, 2004, Enslow timely appealed the Appeals Council's decision to deny review to the United States District Court. Docket No. 1. On December 3, 2004, Enslow filed a memorandum of law in support of her appeal of the denial of review. Docket No. 13. On February 1, 2005, the Commissioner filed a memorandum in support of her decision that Niurka was not disabled. Docket No. 14. The appeal is ripe for determination.[1]

---

[1] The Social Security ALJs face a herculean task. The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals. With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases. The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

## II.     THE PARTIES' POSITIONS

Enslow assigns two errors to the Commissioner.  First, she contends that the ALJ erred by failing to properly consider Niurka's subjective complaints.  Second, she complains that the ALJ's decision was not based on substantial evidence.  The Commissioner argues that the ALJ properly discounted Niurka's subjective complaints as inconsistent with the objective medical evidence in the record, and contends that the record contains substantial evidence in support of the ALJ's decision to deny disability on the ground that Niurka did not meet, medically equal, or functionally equal any listed impairment, and because Niurka did not have "marked and severe" functional limitations.

## III.    THE STANDARD OF REVIEW

### A.     Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.

1991).  The district court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d

835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider

evidence detracting from evidence on which Commissioner relied).

### B.    Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner

without remanding the cause.  42. U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision

fails to provide the district court with sufficient reasoning to determine that the Commissioner

properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066

(11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v.

Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the

Commissioner and enter an order awarding disability benefits where the Commissioner has already

considered the essential evidence and it is clear that the cumulative effect of the evidence establishes

disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v.

Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence

four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence

four, the district court must either find that the Commissioner's decision is not supported by

substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

-5-

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

## IV.   **THE LAW**

### A.   **The Old "Comparable Severity" Standard for Childhood Disability**

Before 1990, a child was "disabled" if he suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an adult from working.  42 U.S.C. § 1382c (a)(3)(1982).  On February 20, 1990, the United States Supreme Court decided *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The Supreme Court determined that the

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

-6-

Commissioner's childhood SSI disability regulations and rulings had failed to implement the SSI

statute enacted by Congress.  The regulations were manifestly contrary to the statute, and exceeded

the Commissioner's statutory authority.  493 U.S. at 541.

The Supreme Court  rejected the Commissioner's argument that a functional analysis of

childhood disability was not feasible, and that a "listings-only" approach to childhood disability was

the only practicable way to determine whether a child's impairment was "comparable."  493 U.S. at

539 - 40.  After *Zebley*, the Commissioner "substantially liberalized" the childhood SSI eligibility

regulations to provide for an individualized functional analysis.  *See* S. REP. NO. 104-96, 104th

Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 351655).

**B.**     **The New "Functional Limitations" Standard for Childhood Disability**

**1.**     **The New Act and Statute**

On August 22, 1996, the President signed into law the Personal Responsibility and Work

Opportunity Reconciliation Act, Pub.L. No. 104-193, 110 Stat. 2105.  The Act amended the

substantive standard for evaluating children's disability claims to read as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this
> subchapter if that individual has a medically determinable physical or mental
> impairment, **which results in marked and severe functional limitations**, and which
> can be expected to result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 1382c (a)(3)(C)(codification of the Act)(emphasis supplied).  A "physical or mental

impairment" is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. § 1382c (a)(3)(D).  The statute does not define "marked and severe

functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined

effect and combined impact of all of the individual's impairments.  42 U.S.C. § 1382c (a)(3)(G).  In

making any determination as to the disability of a child, the Commissioner must also make

reasonable efforts to ensure an evaluation by a qualified pediatrician or other specialist in a field of

medicine appropriate to the child's disability.  42 U.S.C. § 1382c (a)(3)(I).  With respect to a child

with mental impairments, however, Congress has specified that the Commissioner must make every

reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical

portion of the case review and any applicable RFC assessment.  42 U.S.C. § 421 (h).

### 2. The New Regulations

Under express statutory authority, 42 U.S.C. § 405 (a), the Commissioner promulgates

regulations governing eligibility for SSI benefits.  20 C.F.R. Part 416, Subpart I;  *Crayton v.*

*Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The new regulations are codified at  20 C.F.R. §§

416.902; 416.906; 416.924 through 416.926a.[3]

The regulations define the statutory term "marked and severe functional limitations" for

children as "a level of severity that meets or medically or functionally equals the severity of a listing

in the Listing of Impairments in appendix 1 of subpart P of part 404 (the Listing)."  20

---

[3]The superseded text of all regulations appears in 20 C.F.R. following the revised text.

C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.[4]  The regulations set forth the steps

now used in determining disability for children.  20 C.F.R. § 416.924 (effective April 14, 1997):

> We follow a set order to determine whether you are disabled.  If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter.  If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled.  If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924 (a).

Individualized functional assessments for children have been eliminated.  *See* Pub. L. 104-

193, 1996 H.R. 3734, 110 Stat. 2105, 2189;  20 C.F.R. §§ 416.924d and 416.924e (discontinued).

The Commissioner now applies a three-part test in determining a child's disability.  The first

determination is whether the child is working and performing substantial gainful activity.  20 C.F.R.

§ 416.924 (b).  If the child is not working, the Commissioner determines whether the child suffers

from a severe impairment or combination of impairments.  20 C.F.R. § 416.924 (c).  If the child

suffers from a severe impairment or combination of impairments, the Commissioner then determines

whether the child's impairments meet, medically equal, or functionally equal an impairment listed

under Appendix I to Subpart P of Part 404.  20 C.F.R. § 416.924 (d).  The Commissioner evaluates

age, functioning, and other factors in determining whether a child meets a listing.  20 C.F.R. §§

---

[4]Part B provides medical criteria applicable to children in those instances in which Part A does not give appropriate consideration to the particular disease process in childhood.  *See* Parts A and B, Part 404, Subpart P, App. 1.

-9-

416.924a - 416.924c.  Provisions for medical equivalence are established in 20 C.F.R. § 416.926.

Provisions for functional equivalence are established in 20 C.F.R. § 416.926a.  Stated generally, to

functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area

of functioning, or show "marked" limitation in two areas of functioning.  20 C.F.R. § 416.926a (b).

### C.    The Evaluation of Mental Disorders

The structure of the mental disorders listings for children under age 19 parallel the structure

of the mental disorders listings for adults, but it is modified to reflect the presentation of mental

disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The evaluation of disability on the basis of

mental disorders requires the documentation of a medically determinable impairment, as well as

consideration of the degree of limitation applicable to children.  The listing for mental disorders in

children are arranged in eleven diagnostic categories, including attention deficit hyperactivity

disorder (112.11).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  A mental impairment is medically equivalent

to a listed mental impairment if the medical findings are at least equal in severity and duration to the

listed findings.  20 C.F.R. § 404.1526.

For mental disorders, severity is assessed in terms of the functional limitations imposed by

the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings

for mental disorders (motor function, cognitive/communicative function, social function; personal

function, and concentration, persistence, or pace).  20 C.F.R. Pt.404, Subpt. P, App. 1.  In most

functional areas, there are two alternative methods of documenting the required level of severity: 1.)

use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other

medical findings.  *Id.*  The use of standardized tests is the preferred method of documentation if such tests are available.  *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the child's motor, personal,  social, cognitive/communicative functioning, and concentration, persistence and pace.  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases, descriptions of the child's activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to

-11-

resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Children with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such children may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these children's sustained ability to function. It is, therefore, vital to review all pertinent information relative to the child's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive

-12-

information from all sources which have treated the child either currently, or in the time period

relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and

ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may

control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may

or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404,

Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic

medications, particular attention must be focused on the functional restrictions which may persist.

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt.

404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary

remission.  In assessing whether medical improvement has occurred in children with this type of

impairment, the ALJ will consider the longitudinal history of the impairments, including the

occurrence of prior remission, and prospects for future worsening.  Improvement in such

impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. §

404.1594 (iv).

### D.     Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating

physician unless there is good cause to do otherwise.  *See Lewis v.* Callahan, 125 F.3d 1436, 1439 -

1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v.*

*Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527

(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is

well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling

weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report

regarding an inability to work if it is unsupported by objective medical evidence or is wholly

conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where

the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them

such weight as is supported by clinical or laboratory findings and other consistent evidence of a

claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also*

*Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not

warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.)

length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the

treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the

record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to

support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion

is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*,

734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a

medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability.  20

-14-

C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a

physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or

the application of vocational factors because that ultimate determination is the providence of the

Commissioner.  20 C.F.R. § 404.1527 (e).

The ALJ must, however, state with particularity the weight given different medical opinions

and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d

278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a

reviewing court to determine whether the ultimate decision is supported by substantial evidence.

*Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436,

438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The

Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the

social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§

406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a

claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.

*See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the

right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.

*See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d

826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously

probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring

that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735

(citations omitted).

### F.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine whether

the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th

Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a

consultative examination unless the record establishes that such an examination is necessary to

enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir.

1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation

may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative

examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### G.    Credibility

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific

and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,*

67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

-16-

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

V. **APPLICATION AND ANALYSIS**

A. **The Facts**

Niurka was born on December 18, 1988.[5]  She was seen at Arnold Palmer Hospital for Children & Women on July 22, 1999.  She presented with chest pain.  A chest exam revealed borderline cardiomegaly and clear lungs.  R. 123.

On April 3, 2000, Niurka was seen at Arnold Palmer Hospital for Children & Women for a complete pulmonary function evaluation.  She had a history of difficulty breathing.  Her efforts were cooperative and good during the exam.  The total lung capacity was decreased, which was indicative of mild restrictive lung disease.  The evaluation revealed no baseline airway obstruction, normal distribution of ventilation, and no evidence of pulmonary vascular disease. R. 130.

---

[5]Niurka is now 16 years old.

Niurka was diagnosed by a practitioner at Devereux Florida Treatment Network ["Devereux"] on March 28, 2000 with Oppositional Defiant Disorder 313.81 and Depressive Disorder, Not Otherwise Specified 311.00.[6]   R. 138.   Her current GAS and highest GAS in the past year were both 50.[7]   R. 138.   Her disruptive behaviors included impulsive speaking out, excessive noise making and leaving her seat without permission.   R. 139.   She had difficulty completing school work, conflicts with authority, fighting with classmates, conflict with peers and angry outbursts/tantrums.   R. 139.

The Department of Children and Families recommended that Niurka and her siblings continue with therapy to address adjustment to reunification with their mother.   R. 139.   Niurka reported having threatened to suffocate, hang and cut herself.   R. 141.   It was noted that her mother had smoked, consumed alcohol and used crack cocaine on a daily basis during her pregnancy with Niurka.   R. 141 - 42.   In addition, it was noted she had arguments with classmates.   R. 144.   Niurka was impulsive and had chased her sister with a knife, though she denied she intended to harm her

---

[6]The diagnosis codes are from the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) [hereinafter "DSM-IV"], which provides the diagnostic criteria for each mental disorder.  For example, the diagnostic criteria for Depressive Disorder Not Otherwise Specified [DSM-IV 311] includes mental disorders with depressive features that do not meet the criteria for Major Depressive Disorder and other disorders.  DSM-IV at 350.  Examples include premenstrual dysphoric disorder with symptoms severe enough to markedly interfere with work or usual activities; minor depressive disorder (two but not all five of the items required for Major Depressive Disorder); recurrent brief depressive disorder; post-psychotic depressive disorder of Schizophrenia; and a Major Depressive Disorder superimposed on a Delusional Disorder, Psychotic Disorder NOS, or active Schizophrenia; depressive disorders in which the clinician is unable to determine whether it is primary, due to a general medical condition, or substance induced.  DSM-IV at 350.

[7]The Global Assessment of Functioning ["GAF"] Scale, formerly known as the Global Assessment Scale ["GAS"], describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obseessional rituals, frequent shoplifting), OR any serious impairment in social, occupational, or school  functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

sister or herself.  R. 145.  According to the examiner, Niurka seemed to have difficulty regulating emotions, which resulted in her talking back, tantrums and physical aggression.  R. 146.

Lewis Curtwright, D.O. noted that Niurka had expiratory wheezing on March 29, 2000.  She was given an Albuterol inhaler.  R. 170.

Devereux progress notes indicated on April 10, 2000 that Plaintiff had "tantrums" at school on a daily basis "when things were bad."  R. 134.  A psychiatric evaluation was completed on April 28, 2000 at Devereux by Samuel S. McClure, M.D.  R. 149.  Niurka had difficulty with disrespecting authority, peers and aggression towards others.  She had temper tantrums, an inability to accept limits, a negative attitude, impulsivity, excessive noise making, angry outbursts, depression, obsessions, compulsions and hyperactivity.  R. 149.  Niurka was described as irritable, angry and frustrated.  R. 149.  During examination, she had a negative demeanor and negativity in her attitude. Dr. McClure diagnosed Niurka as suffering Depressive Disorder NOS, Oppositional Defiant Disorder and Obsessive Compulsive Disorder.  Her current GAF was 50 (serious symptoms or serious impairment), and her highest GAF in the past year was unknown.  R. 150.

On July 11, 2000, Niurka saw Dr. Curtwright due to bilateral wheezing.  Dr. Curtwright assessed her as suffering asthma.  Niurka was given an albuterol inhaler and a prescription for an antibiotic.  R. 168.

Irving S. Kolin, M.D. saw Niurka on November 2, 2000 for a pre-study visit to consider participation in a Wyeth-Ayerst study of Major Depressive Disorder.  Dr. Kolin noted Niurka's history of treatment for depression, including psychotherapy, until February 2000, and that her depressive symptoms recurred in April 2000 and have continued without treatment.  A K-SADS-PL

-19-

test was consistent with Major Depressive Disorder, and Dr. Kolin found that Niurka met the DSM-IV diagnostic criteria for Major Depressive Disorder.[8]  She was not on medication.  Dr. Kolin noted that Niurka had written a suicide note the previous month.  She had been depressed, and was thinking about cutting her wrists, but did not do so.  R. 152.

At the request of DDS, William A. Austin, Psy.D. completed a disability mental status evaluation on Niurka on June 12, 2001.  She reported obsessive hand washing of 30 to 50 times daily.  While at school, she experienced anxiety when not being able to complete this ritual.  Dr. Austin opined that Niurka had the functional ability to continue to attend school, and that she appeared to have adequate attention and ability to concentrate on tasks.  Niurka was depressed, with blunted affect.  R. 183.  Dr. Austin was diagnosed Major Depressive Disorder, Single Episode and Obsessive Compulsive Disorder.  R. 183 - 84.

On August 5, 2001, Niurka was arrested by the Orlando Police Department, and charged with assault / domestic violence in violation of Fla. Stat. § 784.011, a misdemeanor.  R. 195.  Niurka got into a fight with her sister in a clothing store.  R. 195.  The fight subsided for a while, but later erupted at home.  Niurka told her mother and sister she was going to kill them with a hammer while

---

[8]The diagnostic criteria in the DSM-IV [296.3] for Major Depressive Disorder are the presence of two or more major depressive episodes including: depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day;  feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideation.  Dr. Kolin specified the severity of the Major Depressive Disorder as "moderate."  R. 152.  A "moderate" Major Depressive Episode is one that has a severity between "mild" and "severe."  DSM-IV at 376 - 77.  A "mild" Major Depressive Episode has "few, if any symptoms in excess of those required to make the diagnosis and symptoms result in only minor impairment in occupational functioning or in usual social activities or relationships with others."  DSM-IV at 377.  A "severe" Major Depressive Episode is one that has "several symptoms in excess of those required to make the diagnosis, and symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others."  DSM-IV at 378.

-20-

they slept.  Although she did not have the hammer in her possession at that point, her mother

reported that she had hidden the hammer in her room in the past.  It was noted she had the apparent

ability to carry out her threats, and she admitted that she was "very angry."  R. 195 - 96.  The police

transported Niurka to the Juvenile Corrections Center.

Grena Wang, M.D., a pediatrician from Kaohsiung Medical College, completed a Childhood

Disability Evaluation Form at the request of DDS on September 6, 2001.  According to Dr. Wang,

Niurka had no limitations in the domains of acquiring and using information, attending and

completing tasks, moving about and manipulating objects, and health and physical well-being, and a

less than marked limitation in the domains of interacting and relating with others and caring for

oneself.  R. 223 - 26.  An additional consultant, Pamela D. Green, Ph. D., a clinical psychologist

from the University of Washington also signed the assessment.  R. 223.

Niurka was placed in detention as West Ridge Middle School on September 26, 2001 for

disrespecting others, classroom disruption, acts which disrupted the orderly conduct of class, school

or school functions and insubordination/open defiance.  R. 115.

At the request of DDS,  Ann Adams, Psy.D.. a psychologist educated at the Florida Institute

of Technology, completed a Childhood Disability Evaluation Form on February 28, 2002.  R. 228 -

33.  Mirtha E. Cuevas, M.D., a pediatrician and additional DDS consultant, also signed the form.  R.

229.  Niurka had no limitations in the domains of acquiring and using information, attending and

completing tasks, and moving about and manipulating objects.  She had a less than marked limitation

in the domains of caring for oneself and health and physical well-being.  She had a marked limitation

-21-

in the domain of interacting and relating with others, for which the consulting doctors gave reasons.

R. 230.  The consulting doctors gave reasons for finding her limitations to be marked:

> Claimant's depressive symptoms, including reiterated beliefs that she is not loved by
> her family, lead to verbal confrontations and claimant's behavior escalates to
> screaming and making death threats.  She also threatened suicide in the past.  At
> school, claimant's behavior has improved; she is currently sometimes "sassy,"
> "combative" or " a little hard to handle" but relates fairly respectfully to teachers and
> peers (in that setting, behavior is better controlled, in part, because family-related
> emotional issues drive inappropriate behavior at home.)

R. 230 - 31.

West Ridge Middle School suspended Niurka in-school on May 1, 2002 for ten days for
"gross insubordination and open defiance."  She failed to adhere to instructions.  R. 114.  On
September 26, 2002, she was suspended another ten days for "gross insubordination and open
defiance" — specifically, for repeated acts of misconduct and insubordination.  R. 113.  On January
15 and March 25, 2003, Niurka was suspended for three days, again for repeated acts of misconduct
and insubordination.  R. 111.

Niurka was arrested and charged with disruption of a school function on April 1, 2003.  She
acted in concert to be a disruptive force so as to impede her teacher from performing classroom
instruction.  The teacher had to call the police to try to regain control of his class.  When the police
arrived, Niurka was pointed out as one of the main offenders.  She continued to disrupt the class even
in the officer's presence.  The officer warned Niurka that if she continued the behavior she would be
arrested.  She ceased until the officer left, at which point her disruptive behavior began again.  Niurka
would not allow her teacher to move forward with instruction.  At this point, the officer returned and
arrested her.  R. 122.  The police released her into her mother's custody.  R. 119.

On September 24, 2003 — after the hearing before the ALJ — Tracey G. Henley, Psy.D. completed a Psychological Evaluation at the request of DDS.  R. 238 - 41.  Niurka presented as cooperative but reserved, with dysphoric mood and full range and intensity of affect.  She reported frequently feeling sad, and said she had attempted suicide six months earlier by cutting her wrists and starvation.  She denied having a suicidal plan or intent at present, and also denied any homicidal ideation, plan, or intent.  She reported she was fearful of germs.  She washed her hands 20 times daily and took 45-minute showers.  She was, however, oriented to person, place, time and current events, and she reported that she enjoyed talking on the phone to her friends.

Enslow admitted to Dr. Henley that she drank beer and liquor daily, and used crack cocaine and smoke cigarettes throughout her pregnancy with Niurka.  R. 238.  Her mother identified Niurka as having problems in the areas of oppositional behavior, hyperactivity, social problems, psychosomatic complaints, impulsive behavior and emotional lability.  The combination of Niurka's high-average verbal skill test results and her low-average nonverbal skill test results suggested the possibility of a nonverbal learning disability.  Dr. Henley concluded that there was a lot of conflict in Niurka's relationship with her mother, and that Niurka resented her mother and perceived her family life as conflictual and unstable.  Dr. Henley noted that Niurka had a fear of germs and compulsive behaviors of hand washing and excessive showering, as well as being depressed with suicidal ideation and having exhibited suicidal gestures in the past.  The diagnostic impression was Depressive Disorder NOS, Obsessive Compulsive Disorder, Disruptive Behavior Disorder NOS, and Parent/Child Relational Problem.  R. 241.  Dr. Henley recommended a further psychiatric consultation.  R. 241.

**B.**     **The Analysis**

Enslow's first contention is that the Commissioner erred by improperly discounting Niurka's subjective testimony.  Docket No. 13 at 6.  Enslow is wrong.  Second, Enslow contends that the Commissioner's determinations as to Niurka's limitations in the domain of interacting and relating to others and in the domain of caring for oneself were not supported by substantial evidence.  Enslow is correct.  Docket No. 13 at 7 - 9.  The Court addresses each issue in turn.

**1.**     **Subjective Testimony**

Enslow complains that the ALJ improperly discredited three areas of Niurka's testimony on the grounds that they were not consistent with the minimal clinical findings in the record.  Docket No. 13 at 6.  She contends that, in order to discredit Niurka's testimony, the ALJ indicated that Niurka had attempted suicide in the past but indicated that she told Dr. Henley she had no such plans or intent at the present time.  R. 14.  Contrary to Enslow's contention, the ALJ was not discrediting (or attempting to discredit) Niurka's suicide-related testimony.  Rather, the ALJ explicitly noted that Niurka's testimony regarding previous suicide attempts might be true.  R. 14.  Dr. Henley examined Niurka on September 24, 2003, more than two months after she and her mother testified before the ALJ.  R. 238, 246.  It does not appear that either Niurka or her mother explicitly testified that Niurka harbored suicidal thoughts at the time of the hearing (although Enslow testified that Niurka had talked about suicide as recently as a month prior to the hearing).  R. 265.  However, neither explicitly denied it, either.  To the extent that their testimony suggested that Niurka continued to have suicidal thoughts, the ALJ properly noted that the most recent evidence suggested otherwise.

Enslow also takes exception to the ALJ stating that Niurka had alleged a breathing problem but there was "no evidence of a significant respiratory problem." Docket No. 13 at 7. Enslow maintains that the quoted passage is false, because examination at Arnold Palmer Hospital for Children & Women revealed decreased total lung capacity indicative of a restrictive lung disorder. Docket No. 13 at 7. Actually, the exam in question revealed evidence of "*mild* restrictive lung disease,"not evidence of a significant respiratory problem, as Enslow suggests. Moreover, the quoted passage from the ALJ's opinion has been misrepresented. In assessing the testimony of Niurka and her mother, the ALJ actually wrote that "[a] breathing problem was alleged, but *examinations by two doctors and a chest x-ray have shown* no evidence of a significant respiratory problem." R. 14 (emphasis added). This statement is correct. R. 123, 168, 170, 186, 236. The ALJ properly noted the lack of objective support for this allegation. Niurka's respiratory problem was not severe.

Lastly, Enslow argues that the ALJ erred in not finding Niurka's testimony credible because the ALJ favored Dr. Henley's opinion that Niurka had no marked limitation in interacting and relating to others, but failed to consider the marked limitation found by Drs. Adams and Cuevas. Docket No. 13 at 7, R. 230. Although the Court finds no express consideration of Drs. Adams and Cuevas' finding in the ALJ's opinion, the issues relates less to Niurka's testimony than it does to Enslow's second issue, which the Court discusses below.

### 2.        Substantial Evidence

Enslow argues that the ALJ's determination that Niurka suffered less than moderate limitations in the domain of interacting and relating with others was not supported by substantial

evidence.  Docket 13 at 7.  She points out that Niurka was diagnosed with Oppositional Defiance

Disorder, Obsessive Compulsive Disorder, and Depressive Disorder, that she had repeated instances

of disruptive behavior, arguments with teachers and fighting at school, that she had threatened to kill

her mother and sister, and that she had repeatedly threatened to commit suicide.  Docket No. 13 at 8 -

9.

The ALJ relied upon the following evidence in finding that Niurka had a less-than-marked

limitation in this domain:

> Dr. Henley indicates that while the claimant has problems at home and with her mother,
> and the record indicates some behavioral problems in school, she has developed some
> friendships.  She told Dr. Henley that she talks to her friends on the telephone, and she
> was noted in the record to be cooperative with good eye contact in formal settings.  Her
> teacher also indicated that she was generally respectful of her and other authority
> figures.

R. 17.  Although the ALJ did not explicitly note it, Dr. Henley had found that Niurka suffered a less

than marked degree of limitation in the domain of interacting and relating with others.  R. 243.  The

Commissioner cannot help but concede that Niurka had severe mental disorders and behavioral

problems.  Nevertheless, the Commissioner argues that Dr. Henley's findings provide substantial

evidentiary support for the ALJ's conclusion that Niurka suffered less than a marked degree of

limitation in this domain.

Enslow makes a similar argument regarding the ALJ's finding that Niurka suffered a less-

than-marked limitation in the domain of caring for oneself.  Docket No. 14 at 7.  Enslow points out

that Niurka had a history of Obsessive Compulsive Disorder, washed her hands 30 to 50 times a day,

and took 45-minute showers.  R. 183 - 84.  Niurka experienced anxiety when she could not continue

-26-

these rituals, R. 183, which interfered with the ability of Niurka and her family members to get ready and get to events on time.  R. 272.

In contrast, the ALJ found that Niurka had developed and demonstrated basic skills in the domain of caring for herself, and that her obsessive hand washing did not significantly interfere with normal activities of daily living.  R. 17.  The ALJ was supported by the May 2001 report of Dr. Austin, who noted Niurka's Obsessive Compulsive Disorder and excessive handwashing, but did not find that she suffered any limitations of function due to this condition.  R. 183.  The reports of Dr. Wang, R. 224, and Dr. Henley, R. 243, also support the ALJ's conclusion on this point.  Dr. Wang found that Niurka suffered less than marked limitation in this domain, and Dr. Henley finding she suffered no limitation at all.

The ALJ must state with particularity the weight given different medical opinions and the reasons therefore.  Otherwise, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  If the Commissioner's decision is supported by substantial evidence, the district court will affirm even if the evidence preponderates against the Commissioner's decision.  The district court views the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Where the district court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow the Commissioner to explain the basis for her decision.

Here, the ALJ does not state with particularity the weight given to two DDS  opinions, and the reasons for according them such weight.  DDS Psychologist Ann Adams, Psy.D. and. DDS pediatrician Mirtha E. Cuevas, M.D. found a marked limitation in the domain of interacting and

relating with others in a Childhood Disability Evaluation Form dated February 28, 2002, and gave well-founded reasons. R. 228 - 33. The ALJ did not directly address that opinion. DDS psychologist Tracey G. Henley, Psy.D. completed a Psychological Evaluation on September 24, 2003 which made no express finding as to the degree of limitation. R. 238 - 41. The ALJ relied on Dr. Henley's finding that Niurka does have some friendships and does like to talk to her friends on the telephone, R. 17, to find a less-than-marked limitation in interacting and relating to others. R. 16 - 18. Dr. Henley also recommended a further psychiatric consultation, R. 241, which was not done.

The record as a whole, however, suggests that Niurka may have marked limitations in her ability to interact and relate to others. Niurka was born to a mother who used crack cocaine and liquor during pregnancy. Without doubt, Niurka has serious mental disorders: Major Depressive Disorder, Moderate; Depressive Disorder NOS; Oppositional Defiant Disorder; and Obsessive Compulsive Disorder. Although Dr. Henley is surely correct that Niurka has school friends and makes good eye contact, R. 17, her emotional connection to the two people closest to her — her mother and sister — seems seriously disturbed, even tragic. Conflicts between Niurka and her family members (and even other students in her class) are often resolved inappropriately. Niurka would fight her classmates, R. 139, 144; chase her sister with a knife, R. 145; throw tantrums and engage in physical aggression, R. 146, 149; threaten to kill her mother and sister with a hammer, resulting in her arrest and detention for assault / domestic violence, R.195 - 96; disrupt class, once even requiring police intervention, R.115, 119. Niurka was three times suspended from school. R. 114, 113, 111.

Similarly, the record as a whole suggests that Niurka may have marked limitations in her ability to care for herself.   Rather than care for herself, Niurka has repeatedly threatened to kill herself, suffocate herself, hang herself, starve herself, and cut her wrists.  R. 141.  It can hardly be said that she maintains a healthy emotional state, or that she has found appropriate ways to meet her emotional needs.  Moreover, she has a serious obsessive disorder that causes her to wash her hands 20 to 50 times per day or become anxious.  The case is therefore remanded to the Commissioner to re-evaluate these two domains, to conduct such further proceedings and take such further evidence as the Commissioner may be advised, and to state with particularity the reasons for the weight given to the different psychological and psychiatric opinions.

**VI.**     **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **REMANDED** to the Commissioner of Social Security under Sentence Four of 42 U.S.C. § 405 (g).  The Clerk shall enter a judgment, and close the case.

**DONE AND ORDERED** this 18th day of August, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL 32817